BOARD OF SELECTMEN OF THE TOWN OF
RIDGEFIELD *v.* FREEDOM OF INFORMA-
TION COMMISSION ET AL.
(SC 18343)

Rogers, C. J., and Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.

Argued October 26, 2009—officially released January 5, 2010

*Frederick L. Dorsey*, with whom, on the brief, were *Meredith G. Diette* and *Ashley E. Baron*, for the appellant (plaintiff).

*Valicia Dee Harmon*, commission counsel, with whom was *Daniel P. Hunsberger*, for the appellee (named defendant).

*Opinion*

KATZ, J. The plaintiff, the board of selectmen of the town of Ridgefield (board), appeals[1] from the trial court's judgment dismissing its administrative appeal from the decision of the named defendant, the freedom of information commission (commission). The commission had found that the board violated General Statutes § 1-225 (d),[2] the notice provision of the Freedom of

---

[1] The board appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).

[2] General Statutes § 1-225 (d) provides in relevant part: "Notice of each special meeting of every public agency . . . shall be posted not less than twenty-four hours before the meeting to which such notice refers on the public agency's Internet web site, if available, and given not less than twenty-four hours prior to the time of such meeting by filing a notice of the time and place thereof in the office of the Secretary of the State for any such public agency of the state, in the office of the clerk of such subdivision for any public agency of a political subdivision of the state and in the office of the clerk of each municipal member for any multitown district or agency. The secretary or clerk shall cause any notice received under this section to be posted in his office. Such notice shall be given not less than twenty-four hours prior to the time of the special meeting; provided, in case of emergency . . . any such special meeting may be held without complying with the foregoing requirement for the filing of notice but a copy of the minutes of every such emergency special meeting adequately setting forth the nature of the emergency and the proceedings occurring at such meeting shall be filed with the Secretary of the State, the clerk of such political subdivision, or the clerk of each municipal member of such multitown district or agency, as the case may be, not later than seventy-two hours following the holding of such meeting. The notice shall specify the time and place of the special meeting and the business to be transacted. No other business shall be considered at such meetings by such public agency. In addition, such written notice shall be delivered to the usual place of abode of each member of the public agency so that the same is received prior to such special meeting. . . ."

Information Act (act), General Statutes § 1-200 et seq., by holding a special meeting at which the board decided to ask for, and subsequently voted to accept, the resignation of a town employee, the defendant Anthony Gaeta, under circumstances not constituting an emergency and therefore not excusing compliance with the notice provisions. On appeal, the board contends that the trial court improperly: (1) determined that the emergency meeting provisions of § 1-225 (d) were not unconstitutionally vague; (2) agreed with the commission's conclusion that the contested meeting had not been held under emergency circumstances; (3) concluded that the commission had not abused its discretion in declaring the contested board meeting null and void; and (4) relied on evidence outside the factual findings made by the commission and thereby substituted its own judgment for that of the commission. We affirm the trial court's judgment.

The commission's decision reflects the following undisputed facts. In January, 2006, the fire chief for the town of Ridgefield (town) announced his retirement, prompting a search for a new fire chief. At that time, Gaeta was the assistant fire chief and had served with the town's fire department for approximately thirty-six years. Gaeta initially had been considered as a candidate for the position, but, on March 27, 2006, he was informed that he was no longer being considered.

On March 29, 2006, Gaeta was involved in a verbal altercation with the town's public works director regarding Gaeta's elimination as a candidate for the fire chief position. The next day, the town's human resources director informed Rudy Marconi, the town's first selectperson, about the altercation. Marconi and Gaeta had been lifelong friends. Marconi asked the human resources director to " 'draw up' " a stipend to offer to Gaeta for staying on as " 'acting fire chief' " until a permanent replacement could be hired.

On Friday, March 31, Marconi went to Gaeta's office and gave him a memorandum describing the stipend and confirming that Gaeta would become acting fire chief as of the close of business that day.[3] During the course of their meeting, both men became angry and used vulgar language. Gaeta threw papers at Marconi, moved toward Marconi and threatened to kill him. In response, Marconi told Gaeta that he was going to call a meeting of the board for 9 a.m. the next morning, that Gaeta should attend, and that Gaeta was " 'going to have to answer to the [board].' " Nonetheless, before Marconi left Gaeta's office, he asked Gaeta " 'will you take the job as acting chief or not,' " to which Gaeta responded affirmatively.[4]

Immediately after the meeting with Gaeta, Marconi called the second selectperson, Barbara Manners, and described his encounter with Gaeta. Marconi and Manners decided to call an emergency board meeting for 9 a.m. the next morning, April 1, 2006, to " 'review [Gaeta's] conduct during the past week and during the entire interview process.' " That evening, an administrative assistant called the other board members and informed them of the emergency meeting, without notifying the press or the public. The board convened at 9 a.m. the next morning, without Gaeta present, and

---

[3] Although the commission's decision did not include any findings concerning the exact timing of the fire chief's retirement, the record reflects that his retirement was effective as of approximately 4 p.m. on March 31, 2006. Testimony before the commission indicated a slightly different course of events by which Gaeta received the memorandum confirming his status as acting fire chief, but this discrepancy is not material.

[4] The parties disagree about whether Marconi's statement to Gaeta constituted a job offer or was merely an attempt to confirm that Gaeta would perform the duties of fire chief as required under his contract and pursuant to fire department protocol. Because we conclude that the totality of the circumstances amply indicate that the circumstances did not warrant an emergency meeting of the board; see part I A of this opinion; we need not resolve this dispute.

commenced an executive session.[5] At approximately 11 a.m., the board ended the executive session, voted to ask Gaeta for his resignation and recessed the meeting.

Gaeta then was summoned to the town hall to meet with the board. When he arrived, he was led to a room where Manners was waiting. She informed him that the board was asking for his resignation and that, if he chose not to resign, he would be placed on administrative leave pending an investigation into his conduct. Gaeta responded that neither option was acceptable to him and that instead, he would retire. The board recommenced the meeting and voted to " 'accept [Gaeta's] resignation.' "

The record reflects the following undisputed procedural history. On May 3, 2006, Gaeta filed a complaint with the commission in which he alleged, inter alia, that the board had violated § 1-225 (d) by improperly conducting an "emergency meeting" under circumstances that had not constituted an emergency. Gaeta claimed that, because there had been no emergency, the board had violated § 1-225 (d), which requires public agencies to give twenty-four hours notice to the public before convening a special meeting. In deciding whether the situation had constituted an emergency, the commission, in the absence of a definition of that term in the act, cited to the dictionary definition of "emergency" and drew from the meaning of that term established in *Lebanon* v. *Wayland*, 39 Conn. Sup. 56, 61–62, 467 A.2d 1267 (1983), as well as in prior commission decisions examining the term. The commission determined that Gaeta's actions had not created an emergency and that the board therefore had violated

---

[5] Discussion of employment decisions may be conducted in an executive session of the board from which the public is excluded. Here, because the issue is notice of the board meeting, we do not consider whether an executive session would have been appropriate in a duly noticed meeting. See General Statutes § 1-200 (6) (a).

the notice provisions of § 1-225 (d). Accordingly, the commission declared the board's acceptance of Gaeta's resignation null and void, and ordered the board to comply strictly with the notice provisions of § 1-225 (d).

The board subsequently appealed from the commission's decision to the trial court, claiming that the portion of § 1-225 (d) providing that "in case of emergency . . . any . . . special meeting may be held without complying with the [notice requirements of the act]" was unconstitutionally vague. The board also claimed that, even if the statute was constitutional, the commission improperly determined that the events at issue did not constitute an emergency under § 1-225 (d). Finally, the board claimed that the commission had abused its discretion by declaring the actions taken at the board meeting null and void. The trial court rejected each of these claims, and dismissed the board's appeal. This appeal followed. On appeal, the board disputes each of the trial court's conclusions and also claims that the trial court improperly relied on factual findings not contained in the commission's decision.[6]

I

We begin, as we must, with the board's nonconstitutional claims. See *Carrano* v. *Yale-New Haven Hospital*, 279 Conn. 622, 635 n.15, 904 A.2d 149 (2006) ("[t]his court has a basic judicial duty to avoid deciding a constitutional issue if a nonconstitutional ground exists that will dispose of the case" [internal quotation marks omitted]); see also *State* v. *Cofield*, 220 Conn. 38, 49–50, 595 A.2d 1349 (1991); *Moore* v. *McNamara*, 201 Conn. 16, 20, 513 A.2d 660 (1986).

---

[6] The board properly limits its challenge to the trial court's determination regarding the propriety of the commission's conclusions regarding the *notice* provisions of the act in § 1-225 (d). Accordingly, our analysis focuses solely on whether the April 1, 2006 meeting was *procedurally* proper, and we are not called on to review any substantive element of the employment decision made by the board during the meeting.

Our review of these claims is guided by well established principles. "[J]udicial review of the commissioner's action is governed by the Uniform Administrative Procedure Act [(UAPA), General Statutes §§ 4-166 through 4-189], and the scope of that review is very restricted. . . . [R]eview of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable. . . . Neither this court nor the trial court may retry the case or substitute its own judgment for that of the administrative agency on the weight of the evidence or questions of fact. . . . Our ultimate duty is to determine, in view of all of the evidence, whether the agency, in issuing its order, acted unreasonably, arbitrarily, illegally or in abuse of its discretion." (Internal quotation marks omitted.) *Jim's Auto Body* v. *Commissioner of Motor Vehicles*, 285 Conn. 794, 803–804, 942 A.2d 305 (2008).

Cases that present pure questions of law, however, traditionally invoke a broader standard of review than ordinarily is involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion. Id., 804. We have determined, therefore, that we will defer to an agency's interpretation of a statutory term only when that interpretation of the statute previously has been subjected to judicial scrutiny or to a governmental agency's time-tested interpretation and is reasonable. See *Vincent* v. *New Haven*, 285 Conn. 778, 783–84, 941 A.2d 932 (2008); *Longley* v. *State Employees Retirement Commission*, 284 Conn. 149, 163–64, 931 A.2d 890 (2007).

## A

The board first claims that the trial court improperly determined that the commission properly had con-

cluded that the circumstances at issue did not constitute an emergency under § 1-225 (d). We disagree.

We begin with the language at issue. "Notice of each special meeting of every public agency . . . shall be posted not less than twenty-four hours before the meeting to which such notice refers . . . . Such notice shall be given not less than twenty-four hours prior to the time of the special meeting; provided, *in case of emergency* . . . any such special meeting may be held without complying with the foregoing requirement for the filing of notice . . . ." (Emphasis added.) General Statutes § 1-225 (d). The act does not define emergency, and the commission never has promulgated official regulations defining the term. Although this court never has addressed what this term means in the context of this statute, the commission's construction of the emergency meeting provision of § 1-225 (d) has been subjected to that agency's time-tested application.

In *Lebanon* v. *Wayland*, supra, 39 Conn. Sup. 61, the trial court reviewed the commission's application of the emergency meeting provision from 1977 to 1981. The court concluded that, in these cases, the commission had interpreted this provision to mean "that an emergency meeting may be held only when there is no time for a special meeting notice to be posted twenty-four hours in advance." Id., 62, citing *Olmstead* v. *Coventry*, Freedom of Information Commission, Docket No. FIC 80-109 (January 30, 1981), *Zuraitis* v. *Watertown*, Freedom of Information Commission, Docket No. FIC 78-62 (May 30, 1978), *Bartosiak* v. *Cromwell*, Freedom of Information Commission, Docket No. FIC 78-8 (March 3, 1978), and *Haurilak* v. *Shelton*, Freedom of Information Commission, Docket No. FIC 77-168 (October 5, 1977). The trial court concluded that this interpretation was reasonable and accorded it great weight. *Lebanon* v. *Wayland*, supra, 62. Since the *Lebanon* decision in 1983, the commission consistently has applied

this interpretation of emergency to cases before it. See, e.g., *Stormer* v. *Southbury*, Freedom of Information Commission, Docket No. FIC 2000-015 (June 28, 2000); *Conte* v. *Board of Finance*, Freedom of Information Commission, Docket No. FIC 95-84 (December 27, 1995); *Gries* v. *Board of Selectmen*, Freedom of Information Commission, Docket No. FIC 94-221 (April 26, 1995). Drawing on the dictionary definition of emergency on which it relied in the present case, the commission also regularly has required that emergencies consist of an unexpected situation or sudden occurrence of a serious and urgent nature that demands immediate action. See *Madigan* v. *Keating*, Freedom of Information Commission, Docket No. FIC 2008-281 (January 29, 2008); *Eggen* v. *Planning Commission*, Freedom of Information Commission, Docket No. FIC 1998-113 (August 26, 1998); *Stonington Education Assn.* v. *Board of Selectmen*, Freedom of Information Commission, Docket No. FIC 94-12 (July 27, 1994); *Dixon* v. *Planning & Zoning Commission*, Freedom of Information Commission, Docket No. FIC 88-430 (February 8, 1989).

In light of these numerous decisions covering the period from 1977 to 2008, we conclude that the commission's construction constitutes a time-tested interpretation. Compare *Curry* v. *Allan S. Goodman, Inc.*, 286 Conn. 390, 405–407, 944 A.2d 925 (2008) (numerous decisions over twelve year period was time-tested), and *Hartford* v. *Hartford Municipal Employees Assn.*, 259 Conn. 251, 268, 788 A.2d 60 (2002) (numerous decisions over twenty-five year period was time-tested), with *Connecticut Assn. of Not-for-Profit Providers for the Aging* v. *Dept. of Social Services*, 244 Conn. 378, 390 n.18, 709 A.2d 1116 (1998) (no deference warranted to agency interpretation when agency had failed to make public declaration of interpretation and had applied interpretation for only four years). Therefore, the com-

mission's interpretation is entitled to deference provided it is reasonable.[7] See *Curry* v. *Allan S. Goodman, Inc.*, supra, 407; *Longley* v. *State Employees Retirement Commission*, supra, 284 Conn. 164.

In conducting a limited review for reasonableness, we apply our well established rules of statutory construction. See General Statutes § 1-2z.[8] When, however, a statutory provision is not clear and unambiguous as to the issue at hand, as in the present case, we are not limited in our analysis by the strictures of § 1-2z. "In addition to the words of the statute itself, we look to . . . the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Internal quotation marks omitted.) *Curry* v. *Allan S. Goodman, Inc.*, supra, 286 Conn. 407. Moreover, when, as here, a statute does not define a term, we may look to the dictionary to determine the commonly approved meaning of the term. General Statutes § 1-1 (a);[9] see also *Packer* v. *Board of Education*, 246 Conn. 89, 108, 717 A.2d 117 (1998). In the present case, the commission's interpreta-

---

[7] Because we are satisfied that the commission's interpretation was time-tested, and, as we conclude subsequently in this part of the opinion, reasonable, we need not decide whether a trial court's review of an agency's interpretation would constitute judicial scrutiny sufficient to trigger deference to the agency's subsequent application of that interpretation.

[8] General Statutes § 1-2z provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered."

[9] General Statutes § 1-1 (a) provides: "In the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language; and technical words and phrases, and such as have acquired a peculiar and appropriate meaning in the law, shall be construed and understood accordingly."

tion itself incorporated one dictionary definition of emergency, and our review of various other dictionaries reflect similar meanings ascribed to the term. See American Heritage Dictionary of the English Language (3d Ed. 1992) (defining emergency as "[a] serious situation or occurrence that happens unexpectedly and demands immediate action [or] a condition of urgent need for action or assistance"); Webster's Third New International Dictionary (1961) (defining emergency as "an unforeseen combination of circumstances or the resulting state that calls for immediate action"). These definitions indicate that, for a situation to comprise an emergency, it must be unexpected or unforeseen, and it must necessitate immediate action.

In addition, we consider the commission's interpretation of § 1-225 (d) in light of the policy framework of the act. "[T]he overarching legislative policy of [the act] is one that favors the open conduct of government and free public access to government records. . . . The sponsors of the [act] understood the legislation to express the people's sovereignty over the agencies which serve them . . . and this court consistently has interpreted that expression to require diligent protection of the public's right of access to agency proceedings. Our construction of the [act] must be guided by the policy favoring [access] and exceptions to [access] must be narrowly construed." (Internal quotation marks omitted.) *Pane* v. *Danbury*, 267 Conn. 669, 679–80, 841 A.2d 684 (2004); see also *Glastonbury Education Assn.* v. *Freedom of Information Commission*, 234 Conn. 704, 711–13, 663 A.2d 349 (1995). Because the commission's interpretation limits the circumstances that would allow for, and indeed warrant, meetings without notice to those in which it is unreasonable, both as a matter of time and substance, to meet the notice requirements, that interpretation reasonably advances the interests of the act. Accordingly, we conclude that the commission's

time-tested interpretation was reasonable and thus entitled to deference.

We also must determine, however, whether the commission's application of that interpretation to the facts in the present case was reasonable. Reading the record in the light most favorable to supporting the commission's decision, we conclude that the commission's interpretation was reasonable. First, we note that, even after Gaeta's verbal altercation with the public works director, the town's human resources director drew up a stipend for Gaeta to compensate him for assuming the duties of acting fire chief, which indicates that the board did not believe that there was any reason to take quick action prior to the confrontation between Marconi and Gaeta. Accordingly, we reject any claim that the alleged emergency was created by the earlier altercation between Gaeta and the public works director. Moreover, we note the fact that, at the conclusion of their confrontation, Marconi asked whether Gaeta would assume the duties of fire chief; see footnote 4 of this opinion; which objectively would indicate that Marconi, Gaeta's lifelong friend, did not perceive Gaeta's threat as real or imminent. Marconi's actions, as well as the approximate nineteen hour delay between the confrontation and the board's decision at the meeting, support the commission's finding that there had been no emergency. We thus conclude that the trial court properly determined that the commission had acted reasonably in applying the provisions of § 1-225 (d) to the situation at issue.

B

The board also contends that the trial court improperly determined that the commission's decision, declaring null and void the actions of the board during the April 1, 2006 meeting, had not been an arbitrary and capricious exercise of the commission's authority. Spe-

cifically, the board contends that the commission had abused its discretion by imposing such an extreme penalty when Gaeta had received notice of the board meeting[10] but nevertheless chose not to attend. The board further contends that this penalty was excessive when compared to the penalties imposed in other cases in which strict compliance with § 1-225 (d) had not been met. We are not persuaded.

The following statutes guide our deliberation. General Statutes § 1-206 (b) (2)[11] empowers the commission to order any agency to "provide relief that the commission, *in its discretion*, believes appropriate to rectify the denial of any right conferred by the [act]. The commission may declare null and void any action taken at *any* meeting which a person was denied the right to attend . . . ." (Emphasis added.) Section 1-206 (c) provides in relevant part: "*Any* person who does not receive proper notice of *any* meeting of a public agency in accordance with the provisions of the [act] may appeal [to the commission] . . . . If such commission determines that notice was improper, it may, *in its sound discretion*, declare any or all actions taken at such meeting null and void." (Emphasis added.)

---

[10] The commission claims that Marconi's statement to Gaeta that he intended to call a meeting for 9 a.m. the following morning, which was made in the course of their confrontation and before the meeting officially was called, did not constitute notice to Gaeta. We need not resolve this dispute, however, because we conclude that the trial court correctly determined both that the commission properly had concluded that the board failed to give public notice and that the commission had not abused its discretion in imposing a remedy for the board's violation.

[11] General Statutes § 1-206 (b) (2) provides in relevant part: "In any appeal to the [commission by any person denied any right conferred by the act] . . . the commission may confirm the action of the agency or order the agency to provide relief that the commission, in its discretion, believes appropriate to rectify the denial of any right conferred by the [act]. The commission may declare null and void any action taken at any meeting which a person was denied the right to attend and may require the production or copying of any public record. . . ."

In an analogous context, this court has held that, "[i]f the penalty meted out is within the limits prescribed by law, the matter lies within the exercise of the [agency's] discretion and cannot be successfully challenged unless the discretion has been abused." (Internal quotation marks omitted.) *Pet* v. *Dept. of Health Services*, 228 Conn. 651, 677, 638 A.2d 6 (1994), quoting *Gibson* v. *Connecticut Medical Examining Board*, 141 Conn. 218, 230, 104 A.2d 890 (1954); see also *Boncal* v. *Liquor Control Commission*, 148 Conn. 648, 653, 173 A.2d 593 (1961) ("The plaintiff argues that the penalty of revocation was too severe. . . . The penalty was within the power of the commission to impose, and we cannot say that it acted arbitrarily or illegally in ordering a revocation."). The critical question under the abuse of discretion standard is not whether the reviewing court would have imposed a different penalty, but whether, indulging every reasonable presumption in favor of the commission's decision, the commission reasonably exercised its discretionary power. See *Stokes* v. *Norwich Taxi, LLC*, 289 Conn. 465, 493, 958 A.2d 1195 (2008) ("Under the abuse of discretion standard of review, [w]e will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . [Thus, our] review of such rulings is limited to the questions of whether the trial court correctly applied the law and reasonably could have reached the conclusion that it did." [Internal quotation marks omitted.]). The burden falls on the party challenging the exercise of discretion to demonstrate that the disputed action constituted a clear abuse of that discretion. See *Moraski* v. *Connecticut Board of Examiners of Embalmers & Funeral Directors*, 291 Conn. 242, 260, 967 A.2d 1199 (2009); *Wagner* v. *Clark Equipment Co.*, 259 Conn. 114, 128, 788 A.2d 83 (2002); *Employers Mutual Liability Ins. Co.* v. *Premo*, 152 Conn. 610, 617–18, 211 A.2d 154 (1965).

The board has not carried its burden of demonstrating that the trial court improperly failed to conclude that the commission's decision to declare the meeting null and void had been a clear abuse of its authority. Although the board points to decisions in which the commission declined to impose this penalty for violations of the emergency meeting provision of § 1-225 (d); see, e.g., *Parlato* v. *Traver*, Freedom of Information Commission, Docket No. FIC 2003-410 (September 22, 2004); *Stormer* v. *First Selectman*, Freedom of Information Commission, Docket No. FIC 2000-015 (June 28, 2000); *Eggen* v. *Planning Commission*, supra, Docket No. FIC 1998-113; the commission previously has nullified action taken at an improperly convened emergency meeting. See *Madigan* v. *Keating*, supra, Docket No. FIC 2008-281 (nullifying employment decision made at improperly convened emergency meeting). More significantly, we disagree with the board that our focus should be limited to decisions concerning violations of the emergency meeting provision. A broader examination of commission decisions concerning improperly noticed meetings, generally, demonstrates that the commission acted well within its discretion in declaring the actions at the April 1, 2006 meeting null and void.

In deciding whether to nullify the results of an improperly noticed meeting, the commission historically has looked to the totality of the circumstances, including whether such a remedy would serve the goals of the act or rectify the real effects of the original denial of notice. See *O & G Industries, Inc.* v. *Planning & Zoning Commission*, Freedom of Information Commission, Docket No. FIC 95-218 (May 22, 1996) (declining to declare meeting null and void because doing so would not provide relief appropriate to rectify denial of right to record meeting); *Sousa* v. *Carreiro*, Freedom of Information Commission, Docket No. FIC 94-164 (April 18, 1995) (declining to declare meeting null and void

because complainant attended meeting despite improper notice); *Rizzuti* v. *Mayor*, Freedom of Information Commission, Docket No. FIC 93-307 (May 25, 1994) (considering "the nature of the particular violations, the harm demonstrated, the circumstances surrounding the termination proceedings, and the effect of a null and void order" in declining to declare actions null and void); *Browne* v. *Police Commission*, Freedom of Information Commission, Docket No. FIC 88-105 (June 22, 1988) (declining to declare meeting null and void because doing so "would not in any significant way enhance public input into, or public understanding of, the process leading to the respondent's vote to accept the police chief's contract"). Significantly, the commission has recognized the importance of ensuring public participation in employment decisions regarding public employees; *Pitcher* v. *First Selectman*, Freedom of Information Commission, Docket No. FIC 1999-561 (June 28, 2000) (nullifying employment decision made at improperly noticed meeting because "interested members of the community were denied the right to proper notification that the termination issue would be addressed at the special meeting . . . and therefore, denied the right to attend such meeting"); and has nullified employment decisions made at improperly noticed meetings, *even when the employee was present at the meeting*. See *Tenore* v. *Third Taxing District*, Freedom of Information Commission, Docket No. FIC 1999-241 (December 8, 1999) (nullifying employment decision improperly made during executive session of meeting attended by employee because agenda did not adequately give notice of subject of executive session).

In the present case, the board's action not only had a substantial impact on Gaeta, a thirty-six year fire department veteran, but also presumably would have been a matter of interest to the public, as it left the town without the services of either its just retired fire

chief or its assistant fire chief who temporarily was to assume that position. In light of the commission's previous decisions, these facts demonstrate that the commission's decision to declare the board's acceptance of Gaeta's resignation null and void was not so far outside the usual course of the commission's actions as to constitute an abuse of discretion. Accordingly, the trial court properly determined that the board had failed to demonstrate that the commission's imposition of a remedy within its statutory authority was improper.

C

The board also contends that the trial court improperly relied on facts not found by the commission,[12] in excess of its statutory authority under the UAPA. We conclude that the board is not entitled to relief on the basis of this claim because any impropriety on the part of the trial court was harmless.

As we previously have noted, the UAPA requires reviewing courts to defer to agency fact-finding. See, e.g., *Goldstar Medical Services, Inc.* v. *Dept. of Social Services*, supra, 288 Conn. 833; *Jim's Auto Body* v. *Commissioner of Motor Vehicles*, supra, 285 Conn. 816. We note additionally that "[h]armless error analysis is available in the administrative context"; *Levy* v. *Commission on Human Rights & Opportunities*, 236 Conn. 96, 110, 671 A.2d 349 (1996); and that "[t]he harmless error standard in a civil case is whether the improper ruling would likely affect the result." (Internal quotation marks omitted.) *Smith* v. *Andrews*, 289 Conn. 61, 68, 959 A.2d 597 (2008). In light of our conclusion in part

___

[12] The board specifically objects to the following statement in the trial court's memorandum of decision, in which the court stated that the commission had found that "Gaeta's threat occurred in the context of an argument between two lifelong friends, that no police protection was called for either during the meeting or after, and that the dispute had been sufficiently resolved at the conclusion of the meeting. Gaeta's earlier outburst with [the public works director] had not required official intervention."

I A of this opinion that the commission, acting on its unchallenged factual findings, properly concluded that the circumstances at issue did not constitute an emergency and properly declared the April 1, 2006 meeting null and void, any impropriety by the trial court in finding facts outside of the record did not likely affect the result. We therefore decline to consider whether the trial court exceeded its authority under the UAPA. See, e.g., *Monti* v. *Wenkert*, 287 Conn. 101, 128, 947 A.2d 261 (2008) (declining to reverse judgment on basis of claim that opposing party improperly had failed to disclose relevant agreement because any such impropriety would not likely affect result); *Wasfi* v. *Dept. of Public Health*, 60 Conn. App. 775, 787, 761 A.2d 257 (2000) ("[e]ven if we were to conclude that the [state board of veterinary medicine] violated [General Statutes] § 4-178, we conclude that [its] finding on this specific issue nonetheless constituted harmless error under the circumstances of this case"), cert. denied, 255 Conn. 932, 767 A.2d 106 (2001).

## II

Finally, we turn to the board's constitutional claim, namely, that the trial court improperly concluded that the emergency meeting provision of § 1-225 (d) was not void for vagueness. Specifically, the board points to the phrase in § 1-225 (d) providing that "in case of emergency . . . any . . . special meeting may be held without complying with the [notice requirements of the act]" as unconstitutionally deficient. According to the board, the provision's vagueness derives from the act's failure to define the term emergency and the commission's failure to adopt regulations defining that term. As a result, the board claims that the emergency meeting provision of § 1-225 (d) did not provide fair warning that it applied to the conduct at issue, and that the board was the victim of arbitrary enforcement of the statute. We are not persuaded by the board's arguments,

and, accordingly, we decline to strike the challenged portion of the statute.

We first set forth our well established precedent governing challenges to statutes on vagueness grounds. The vagueness doctrine derives from two interrelated constitutional concerns. See *Hogan* v. *Dept. of Children & Families*, 290 Conn. 545, 575, 964 A.2d 1213 (2009); *Gonzalez* v. *Surgeon*, 284 Conn. 573, 583, 937 A.2d 24 (2007); *Rocque* v. *Faricielli*, 269 Conn. 187, 204, 848 A.2d 1206 (2004). First, statutes must provide "fair warning" by ensuring that "the person of ordinary intelligence [has] a reasonable opportunity to know what is prohibited, so that he may act accordingly." (Internal quotation marks omitted.) *Packer* v. *Board of Education*, supra, 246 Conn. 99–100; accord *Hogan* v. *Dept. of Children & Families*, supra, 575. Second, in order to avoid arbitrary and discriminatory enforcement, statutes must establish minimum guidelines governing their application. See *Hogan* v. *Dept. of Children & Families*, supra, 575; *Gonzalez* v. *Surgeon*, supra 583; *Packer* v. *Board of Education*, supra, 100.

A statute will be void for vagueness only if, making every presumption in favor of the statute's validity, its meaning cannot be fairly ascertained. See *Gonzalez* v. *Surgeon*, supra, 284 Conn. 585–86; *Ferreira* v. *Pringle*, 255 Conn. 330, 355, 766 A.2d 400 (2001). In examining a void for vagueness claim, we determine the constitutionality of the challenged statute by considering its applicability to the particular facts of the case. See *Rocque* v. *Faricielli*, supra, 269 Conn. 204–205; *Packer* v. *Board of Education*, supra, 246 Conn. 105. Because legislative enactments carry with them a strong presumption of constitutionality, any party challenging the statute on vagueness grounds bears the burden of demonstrating beyond a reasonable doubt that he or she had inadequate notice of what was prohibited or that he or she has been the victim of arbitrary and discrimi-

natory enforcement. See *State* v. *Lewis*, 273 Conn. 509, 516, 871 A.2d 986 (2005); *Rocque* v. *Farricielli*, supra, 206; *Packer* v. *Board of Education*, supra, 107. Moreover, we are mindful that, "[b]ecause perfect precision is neither possible nor required . . . the [vagueness] doctrine does not mandate the invalidation of all imprecisely drafted statutes. . . . A statute is not unconstitutional merely because a person must inquire further as to the precise reach of its prohibitions, nor is it necessary that a statute list the exact conduct prohibited." *Packer* v. *Board of Education*, supra, 101; accord *Hogan* v. *Dept. of Children & Families*, supra, 290 Conn. 575.

The board claims that the act's failure to provide definitions or guidelines concerning what constitutes an emergency provided no meaningful indication that the notice requirement would apply to the April 1, 2006 special meeting. In determining whether a statute is sufficiently precise, however, we allow neither those subject to the provision, nor those who enforce it, to close their eyes to authorities beyond the text that shed light on the text's meaning. The vagueness inquiry, therefore, must take into consideration both textual and extratextual sources as they existed at the time of the board's actions. See *Hogan* v. *Dept. of Children & Families*, supra, 290 Conn. 575 ("[r]eferences to judicial opinions involving the [statute], the common law, legal dictionaries, or treatises may be necessary to ascertain a [statute's] meaning to determine if it gives fair warning" [internal quotation marks omitted]); *Gonzalez* v. *Surgeon*, supra, 284 Conn. 585–86 ("[t]his court previously has held that when the meaning of a statute is clear from the statute's *context, purpose and legislative history*, the fact that the language of the statute may be susceptible to more than one reasonable interpretation does not render it unconstitutionally vague" [emphasis added]).

As noted in part I A of this opinion, reference to the dictionary definition of the term emergency provides clear notice that an emergency involves a serious, unexpected situation that necessitates immediate attention. This understanding of emergency accords with the meaning that the commission has ascribed to the term through its decisions, which are publicly available. See, e.g., *Stormer* v. *Southbury*, supra, Docket No. FIC 2000-015; *Eggen* v. *Planning Commission*, supra, Docket No. FIC 1998-113; *Conte* v. *Board of Finance*, supra, Docket No. FIC 95-84; *Gries* v. *Board of Selectmen*, supra, Docket No. FIC 94-221; *Stonington Education Assn.* v. *Board of Selectmen*, supra, Docket No. FIC 94-12; *Czaja* v. *Bromley*, Freedom of Information Commission, Docket No. FIC 91-169 (October 9, 1991). Moreover, the well established policy underlying the act clearly indicates that the act's provisions must be read to *limit* the ability of public agencies to hold improperly noticed meetings. Cf. *Glastonbury Education Assn.* v. *Freedom of Information Commission*, supra, 234 Conn. 712–13 ("[i]n light of [the principles of the act], the statutory definition of public meetings . . . must be read to limit rather than to expand the opportunities for public agencies to hold closed hearings").

The commonly approved meaning of the term emergency, its historical application by the commission within the context of the act, and the established policy of the act all demonstrate that a person of ordinary intelligence would know with a reasonable degree of certainty that, in order to qualify as an emergency under § 1-225 (d), a situation must be *unexpected* and it must demand *immediate* action such that it is impossible for the public agency to give twenty-four hours notice of a meeting. In order to succeed on its vagueness challenge then, the board must demonstrate that this established meaning provided no meaningful indication that the situation at issue did not warrant conducting a meeting without notice. See *Packer* v. *Board of Education*, supra, 246 Conn. 107, 109–10.

When considered in light of the circumstances of this case, the board's vagueness challenge fails. As we previously have noted, approximately seventeen hours elapsed between Marconi's confrontation with Gaeta and the commencement of the meeting of the board to decide how to address Gaeta's conduct. The record reflects no interim measures taken by the board to neutralize any threat from Gaeta. Instead, Marconi's statements to Gaeta at the end of their confrontation essentially had confirmed with Gaeta that he would remain in control of emergency services despite the allegedly explosive circumstances. We therefore conclude that the board had adequate notice that calling a meeting to wrest control from Gaeta seventeen hours after his confrontation with Marconi, without taking any intermediate steps to diffuse the alleged threat to Marconi, other town employees or the public, did not constitute an emergency. Section 1-225 (d) was thus sufficiently specific to give fair notice and to preclude arbitrary enforcement, and, accordingly, the trial court properly concluded that the provision was not unconstitutionally vague.

The judgment is affirmed.

In this opinion the other justices concurred.